**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| **Donald P. Snyder,** | ) | **CASE NO. 1: 11 CV 2275** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Pierre's French Ice Cream Co.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

This action alleges claims under the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.* (the ADEA).  Pending before the Court is Defendant's Motion for Summary Judgment (Doc. 15.)  For the reasons stated below, the motion is granted in part and denied in part.

**Facts**

Defendant Pierre's French Ice Cream Company (Pierre's) is an Ohio corporation that manufactures and distributes ice cream products.  Pierre's is a union employer and is a party to a collective bargaining agreement (the CBA) with the Teamsters Local 336 (the union).  (Pltf. Dep. at 92-95.)  Article II, Section K of the CBA expressly prohibits unlawful discrimination and harassment in the workplace.  (*Id.* at 92, 99.)  Article XI sets forth a

1

grievance and arbitration procedure by which to address "all complaints, disputes, controversies, or other grievances" involving questions of interpretation or application of the terms and provisions of the CBA.  (*Id.* at 96.)

Plaintiff Donald Snyder, a member of the union, was hired by Pierre's on August 25, 2003 at the age of 49.  Plaintiff first served at Pierre's as an "order puller."  In 2007, plaintiff bid into a "dock" position.  In both of the positions he held, plaintiff worked the second shift in Pierre's warehouse, which was overseen by Night Warehouse Manager John Bittinger.

Plaintiff had "good knowledge" of the CBA and served as a union steward from 2007 until his layoff in January 2010.  (Pltf. Dep. at 81, 82, 95.)  During his employment, he filed a record number of grievances at Pierre's pursuant to the CBA regarding a variety of issues. (Roth Aff., ¶22.)

Pierre's laid off workers in early 2010 for the first time in many years.  The layoffs were necessitated by a reduction in sales over time caused by increased competition from large global companies, the loss of a significant customer (Jack & Jill Ice Cream Company) and other customers, and a downturn in the economy.  (Pltf. Dep. at 109-11, 172, Bittinger Dep. 33-34.)  In addition, Pierre's labor needs decreased because it increased worker productivity by updating its technologies and improving its facilities in order to remain competitive in the marketplace.  (Roth Aff., ¶¶ 10-12.)  Pierre's laid off eleven employees in January 2010, seven of whom were bargaining unit members.  Plaintiff was laid off on January 29, 2010.  The January 2010 layoffs were accomplished in seniority order in accordance with Article V of the CBA.  Plaintiff's selection for layoff resulted from his place on the union seniority list.  (Pltf. Dep. at 100, 108, 113; Roth Aff., ¶15.)  Four non-union

2

employees were also laid off by Pierre's in January 2010.

Beginning in May 2010, Pierre's recalled some employees who had been laid off due to increased seasonal demand during warmer months of the year.  As with the layoffs, union seniority governs the order of recall under the CBA.  (Pltf. Dep. at 102.)  Three employees with more seniority than plaintiff were recalled in May 2010.  James Crowder was called back to work on May 3, 2010.  Roberto Cruz was called back on May 10, 2010.  Chris Pogozelski was recalled on May 23, 2010.  Crowder, Cruz, and Pogozelski are all more than 10 years younger than plaintiff.  According to plaintiff, he was next in line to be called back to work by order of seniority.  However, plaintiff, and two bargaining unit employees with less union seniority and younger than plaintiff, Charles Hohne and Steven Bibb, were not recalled by Pierre's.

Additional opportunities for part-time or seasonal labor arose at Pierre's in the summer of 2010, but instead of recalling full-time union workers on layoff to fill these part-time and seasonal positions, Pierre's hired part-time union employees with no seniority from temporary staffing firms to fill these positions.  (Pltf. Dep. at 114-15.)  The CBA affords Pierre's the right to hire a set number of part-time workers – who receive a lower wage than full-time bargaining unit employees and do not accrue seniority or receive benefits – even while full-time bargaining unit members are on layoff status.

Plaintiff objected to not being recalled by Pierre's despite the opportunities for part-time work.  Plaintiff contends that in the past, it was Pierre's practice to hire laid off employees for part-time jobs.  On May 25, 2010, plaintiff filed a grievance challenging Pierre's use of temporary workers to fill positions previously performed by full-time workers

3

while he and other bargaining unit employees remained on layoff.  Plaintiff's position was that Pierre's did not have the right to use part-time workers to fill positions previously performed by full-time workers under the terms of the CBA.  In particular, plaintiff contended that Pierre's improperly used temporary employees to fill full-time positions that became available as a result of the retirements of employees Joe Nagy and Robert "Ducky" Dutkovic. Plaintiff contended that in both instances Pierre's hired part-time employees with no seniority (Steve Sopko, 35 years younger than plaintiff and Chris Weaver, 13 years younger than plaintiff) to fill these open positions.  Plaintiff's grievance in this regard proceeded to arbitration on October 25, 2010.  The arbitrator denied plaintiff's grievance and found that Pierre's could use the part-time workers.  (Pltf. Dep. at 123.)[1]

In July 2010, six months after his layoff, plaintiff sent a letter to Pierre's "Human Resources Director" asserting age discrimination.  Plaintiff's letter, dated July 2, 2010, stated:

> I write to complain about age discrimination that is being leveled against me.  I request that you investigate the situation and correct it.  I am a dock worker at Pierre's.  My supervisor, John Beninger [correctly, Bittinger] told me in the past that he did not appreciate Dave Scilian [correctly, Cillian] hiring older people from Area Temps.  Another time, he said to me "Nothing against you Don but if I were in charge at the time they were hiring, I would not have hired you because you're just too old."
>
> I was laid off on January 29, 2010.  I have not been called back to work despite there being several openings for which I should have been considered due to my seniority.  However, Pierre's has not called me back to fill any of those open positions.  I feel it is because of my age.  Please investigate this and

---

[1]

Plaintiff had previously filed grievances regarding a part-time worker.  In grievances he filed in December 2006 and February 2007, plaintiff objected when a part-time worker who worked 32 hours won a bid for a full time job.  Plaintiff contended the worker did not have seniority over full time employees who bid on the job.  The union's position was that the employee had seniority.  After agreeing to disagree with the union on the matter, plaintiff retracted his grievances.  (Pltf. Dep. at 128-129.)

4

correct this situation.

This was the first time plaintiff formally complained of age discrimination.

Plaintiff and his co-worker, Ken Ashcraft, testified in depositions that Bittinger repeatedly made age-related comments to them at work over a number of years.  Plaintiff testified that the comments began in late 2007/early 2008 and continued until plaintiff was laid off.  According to plaintiff and Ashcraft, Bittinger repeatedly told them that they worked too slowly; that Bittinger called plaintiff such names as "old man" and asked him if he "needed a cane," "a walker," and an "oxygen tank."  Bittinger also complained about the age of men being sent to him to work on the dock.  According to plaintiff and Ashcraft, Bittinger told plaintiff and Ashcraft:  "[N]o offense but if I were in charge I would not have hired you two.  You are just too old."  According to plaintiff and Ashcraft, the age-related comments by Bittinger were made every day and escalated to the point that they were abusive, humiliating, and "not funny."  (Pltf. Dep. at 66, 71, 172; Ashcraft Dep. at 32.)  Plaintiff testified that he feared that he would lose his job.

Plaintiff testified that he complained to Dave Cillian, the Manager of Operations who oversaw the warehouse, about Bittinger's comments seven to eight times between 2008 and 2009 without avail.  (Cillian was identified in Pierre's discovery responses as one of the decision-makers with respect to the recall of laid off employees.)  (Pltf. Dep.at 66-67.)  Cillian responded to plaintiff's complaints by telling plaintiff that "John needs people skills.  He don't have people skills."  (*Id*. at 66.)  Cillian told plaintiff that he would talk to Bittinger, but plaintiff does not know if that ever happened.  According to plaintiff, Bittinger's behavior did not change.

5

Other than complaining to Cillian, plaintiff did not initiate any formal complaint or grievance regarding Bittinger's alleged age-related comments (even though plaintiff acknowledged that he was familiar with the CBA and its anti-discrimination provision), or asserting age discrimination, until he sent the July 2, 2010 letter to Pierre's Director of Human Resources sixth months after he was laid off.  Plaintiff testified that Bittinger also "rode," harassed, and was abusive towards other employees in the warehouse who Bittinger wanted to "push" out, including younger employees.  (Pltf. Dep. at 72.)  In addition, plaintiff testified that "shop talk," swearing, and name calling among co-workers was part of the atmosphere in the warehouse and that workers routinely joked with each other.  Plaintiff testified that he participated in the shop talk.  In response to Bittinger's comments, plaintiff repeatedly referred to Bittinger as "balloon head," "fat boy," "beached whale," and "Pillsbury dough boy."  (Pltf. Dep. at 170-71.)  Plaintiff referred to his co-worker Ken Ashcraft as "Ass"croft; he referred to his co-worker Chuck Hohne as Chuch "Horny"; and he referred to a co-worker named George as "Brutal" because he "didn't have a neck" and reminded plaintiff of Popeye.  (Pltf. Dep. at 169-70.)

After plaintiff wrote the July 2, 2010 letter, Pierre's Human Resources Director, Gail Sullivan, met with and discussed plaintiff's complaints with him.  (Pltf. Dep. at 182.)  Pierre's initiated an investigation into the situation in which it interviewed plaintiff, Cillian, Bittinger, as well as other Night Warehouse employees.  After conducting its investigation, the company found that no age discrimination had occurred, that Bittinger did not make age-related comments to plaintiff, and that there was nothing related to plaintiff's hiring, job responsibilities, or lay off that was age related.  Rather, the company found that Mr. Bittinger

6

"jokes around with his crew" and that the employees he supervises "like and respect him, and understand his sense of humor."  Sullivan notified plaintiff in writing in August 2010 that an investigation had been conducted and that based on the company's interviews with managers, it found that there was "no age discriminatory behavior at the company."  Bittinger was counseled to be "more professional and diplomatic" when speaking with employees.

On August 26, 2010, plaintiff filed a charge of age discrimination with the Equal Employment Opportunity Commission (EEOC) complaining about Pierre's use of temporary workers while he remained on layoff status and that he had been subjected to a hostile work environment because of his age by his supervisor John Bittinger.  The EEOC subsequently issued a dismissal and a right to sue letter on July 25, 2011.  Plaintiff filed this action on October 24, 2011, alleging two claims under the ADEA.  Count I of plaintiff's complaint alleges a claim of disparate treatment.  Plaintiff alleges that he has been discriminated against by Pierre's because of his age "as Pierre's has not recalled  him to work when there were open position[s] and available work and instead filled those full-time position with part-time temporary workers."  (Complt., ¶ 20.)  In support of this claim, plaintiff alleges that after the January 2010 layoffs, Pierre's subsequently recalled three younger union workers with more seniority than plaintiff to fill positions that became available.  However, after these younger workers were recalled (leaving plaintiff with the next most amount of seniority), Pierre's did not recall plaintiff back for any open work but instead filled subsequently available work opportunities with part-time temporary workers rather than considering him.  (Complt., ¶¶ 17, 18.)  Plaintiff contends that Pierre's disfavored him with respect to recall opportunities because of his age.

7

Count II alleges a claim for "age harassment" under the ADEA. Plaintiff alleges that he was subjected to harassment by Pierre's due to his age and that this harassment had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile, and offensive work environment." (Complt., ¶ 44.)

Pierre's moves for summary judgment on both of plaintiff's claims.

**Standard of Review**

Federal Rule of Civil Procedure 56 governs summary judgment and provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to "materials in the record," including depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1986). In order to defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its position. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-

8

50 (1986).  In determining a motion for summary judgment, the non-moving party's evidence

is to be believed, and all justifiable inferences are to be drawn in that party's favor.  *Id.* at

255.

**Discussion**

*Count I:  Disparate Treatment*

The ADEA prohibits an employer from refusing to hire, discharging, or otherwise

discriminating against an employee "because of such individual's age."  29 U.S.C. §

623(a)(1). "'The ultimate question in every employment discrimination case involving a

claim of disparate treatment is whether the plaintiff was the victim of intentional

discrimination.'" *Geiger v. Tower Auto*., 579 F.3d 614, 620 (6th Cir.2009) (quoting *Reeves v.*

*Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 153 (2000)).

To state a *prima facie* case on a disparate treatment theory using circumstantial

evidence, a plaintiff must establish the four elements of the test established in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The plaintiff must show that he:  (1) was a

member of a protected class; (2) was subjected to an adverse employment action; (3) was

qualified for the position in question; and 4) was replaced by someone outside of the

protected class or treated differently than a similarly situated non-protected employee.

*Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-11 (6th Cir. 2002).  The fourth prong of the test

requires the plaintiff to show that the person treated more favorably was similarly situated to

the plaintiff in all relevant respects.  *Id.* at 610-11.  Where the allegations of discrimination

arise from a "workforce reduction," the fourth requirement is modified so that the plaintiff

must also demonstrate some "direct, circumstantial, or statistical evidence tending to indicate

9

that the employer singled out the plaintiff . . . for impermissible reasons." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990), *cert. denied*, 498 U.S. 878 (1990)).

Once a plaintiff satisfies his *prima facie* burden, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008).  If the employer meets this burden, the burden of production shifts back to the plaintiff to show that the employer's explanation is a mere pretext for intentional age discrimination.  *Id.*

Pierre's contends that plaintiff cannot make out the fourth element of a *prima facie* case because plaintiff "has acknowledged that the layoff and recall decisions for bargaining unit employees occurred in accordance with the CBA."  Therefore, Pierre's reasons, all employees including plaintiff were "subject to same non-discretionary seniority provisions" with respect to Pierre's layoff and recall actions.  (Def. Mem. at 12.)  Pierre's also emphasizes the fact that Charles Hohne and Steven Bibb, two other bargaining unit employees who were substantially younger than plaintiff and lower than plaintiff in seniority, were also not recalled for work.

Pierre's further contends plaintiff cannot demonstrate the fourth element of a *prima facie* case because he cannot show that he was "replaced" by another employee.  In this regard, Pierre's relies on *Campbell v. PMI Food Equipment*, 509 F.3d 776, 785 (6th Cir. 2007), which held that laid off bargaining unit employees were not replaced by temporary employees who were hired, employed, and assigned to fill bargaining unit vacancies after a layoff by a third party employment agency.  Pierre's asserts that, like the employer in

10

*Campbell*, it "does not play a role in choosing its temporary workers and does not have knowledge of the workers' ages or other characteristics before they arrive at the plant"; therefore, plaintiff was not "replaced" by such temporary workers.

Finally, Pierre's argues that there is no direct, circumstantial, statistical evidence of age discrimination, asserting that Bittinger's alleged ageist comments "are not probative of any age-based animus in the selection process, because Mr. Bittinger did not participate in the layoff or recall decisions or the decision to use temporary workers."  (Def. Mem. at 13.)

Plaintiff disputes Pierre's position that Bittinger does not play a role in deciding what employees were recalled.  Plaintiff also contends that Pierre's did treat similarly situated employees outside of his protected class more favorably than him.  (Pltf. Opp. at 10-11.) Plaintiff's theory is that, although the layoffs and recalls were done in proper seniority order, Pierre's engaged in a "recall process that favored anyone but [plaintiff]" due to Pierre's preference for younger workers.  Thus, plaintiff asserts that:

> In May 2010, Pierre's treated Crowder, Cruz, and Pogozelski more favorably than [him].  Crowder, Cruz and Pogozelski were all recalled to part-time seasonal work.  These employees were more than 20 years younger than [plaintiff].  Crowder, Cruz and Pogoselski all received call backs to part-time seasonal work.  Snyder did not.

(Pltf. Opp. at 11.)

Plaintiff asserts, however, that "[w]hen future opportunities for part-time work arose with [him] next in line for recall, Pierre's ch[ose] to hire temporary workers" instead of recalling a bargaining unit employees.  Plaintiff asserts that additional opportunities "for part-time work arose in May, June, and July 2010" that "directly or indirectly gave Pierre's the chance to recall Snyder," but in each of these instances, instead of recalling him or offering

11

him an opportunity to bid on available part-time jobs, Pierre's hired temporary workers outside of plaintiff's protected class.  Plaintiff sets forth a chart in his brief identifying the following "developments" that arose where plaintiff was next in line to be recalled where Pierre's hired temporary workers:  (1) "Noga Retirement" in April 2010, where a "temp," Steve Sopko was hired; (2) "Dutkovic Retirement" on June 25, 2010 where "Holland Won [the] Bid"; (3) "Holland's Position" (that became open when Holland won bid for Dutlovic's position) where "temp" worker Chris Weaver was hired from June 28, 2010 through January 19, 2011; (4) "Bergeant's Leave" in June 2010 where Chris Weaver was hired; (5) "Pogo's resignation" on July 22, 2010 where "temps" Luis Massas, Davy Alvarez, and Ken Brewer were hired, (6) "Dock "A" Seasonal" position available in June 2011 where plaintiff was not given a chance to bid.

Plaintiff asserts that "[i]t is clear that Pierre's deviated from its traditional practice of hiring laid off employees for part-time jobs" and that "[b]etween 2010 and 2012, Pierre's alternated between temporary hires and recalling full time employees on layoff based upon whether or not [plaintiff] was next in line."  That is, "temporary or full time employees outside of Snyder's protected class, were treated more favorably than Snyder because of Pierre's preference for younger workers in the warehouse."  (Pltf. Opp. at 12.)  Plaintiff asserts:  "Crowder, Cruz, Pogozelski, Sopko, Weaver, Masses, Alvarez, [and] Brewer were all treated more favorably than Snyder.  But for Snyder's age, Snyder would have been recalled when opportunities arose with Snyder next in line."  (*Id*.)

Pierre's disputes in its reply brief that the identified temporary workers were "similarly situated to plaintiff."  Pierre's asserts that, unlike plaintiff, "[t]hese temporary, part

12

time workers are employed by a temporary agency and assigned to work at Pierre's when seasonal demand necessitates the need for additional temporary labor.  They receive lower wages and no employee benefits.  Pierre's does not make medical benefits contributions, multiemployer pension plan contributions or 401k contributions on their behalf; nor does it provide for workers' compensations or unemployment compensation insurance for them."

In addition, Pierre's disputes that it used the temporary workers "to fill open bargaining unit positions as they became available."  Pierre's contends that, contrary to plaintiff's rendition of the facts, Sopka did not "replace" Joe Noga but worked for two days only in May 2010; Brewer only worked for four days from August 3 to August 6, 2010; Massas and Alvarez each worked only one day in July 2010; and Chris Weaver did not "replace" Dutkovic or Holland but worked as a temporary employee for a little over sixth months, from June 28, 2010 to January 19, 2010, in the Plant Hardening Room rather than the Night Warehouse where plaintiff worked.  But Pierre's does not specifically address the bargaining unit employees who were recalled by Pierre's after being laid off, Crowder, Cruz, Pogozelski, or explain why these employees are not "similarly situated" to plaintiff.

The Court agrees with Pierre's that plaintiff cannot be said to be "similarly situated" to the temporary workers plaintiff identifies because there is no dispute that the temporary workers were not full time bargaining unit employees and were not entitled to the same pay and benefits as plaintiff and other full time union bargaining unit members (thus, the temporary workers were not similarly situated to plaintiff "in all relevant respects").  Further, plaintiff does not dispute Pierre's assertion that the temporary workers were selected and hired by a third party employment agency and not Pierre's.  However, as noted above,

13

Pierre's does not explain why Crowder, Cruz, and Pogozelski, cannot be considered "similarly situated" to plaintiff.  Unlike the temporary workers, Crowder, Cruz, and Pogozelski were full time bargaining unit employees like plaintiff who were laid off.  Therefore, they are "similarly situated" to plaintiff in the respects relevant here.  Crowder, Cruz, and Pogozelski are all substantially younger than plaintiff and were recalled by Pierre's to part-time or seasonal positions after they were laid off.  Although it is undisputed that Crowder, Cruz, and Pogozelski had more seniority than plaintiff and were entitled to be recalled to work before plaintiff according to union seniority, plaintiff's theory is that Pierre's recalled these younger workers to part-time seasonal work when they were next in line to be recalled by order of seniority but treated him less favorably when he was in the senior position.  That is, when plaintiff was next in line to be recalled for seasonal part-time work after the January layoffs according to seniority, instead of recalling him as it did with Crowder, Cruz, and Pogozelski, Pierre's chose to depart from its historical practice of allowing bargaining unit employees to bid on seasonal, part-time work and hired temporary workers instead.

   The Court also finds that there is sufficient evidence to make out the fourth element of a *prima facie* case.  There are sufficient facts to show that "similarly situated" employees (*i.e.*, full time bargaining unit employees laid off in January 2010) outside of plaintiff's protected class were treated more favorably than plaintiff with respect to recall opportunities at Pierre's.  As plaintiff asserts, Crowder, Cruz, and Pogozelski all received call backs to part-time seasonal work, but plaintiff did not.  And even assuming that this case constitutes a "reduction

in force" case as Pierre's contends,[2] the Court finds there is sufficient direct, circumstantial, or statistical evidence tending to indicate that Pierre's singled plaintiff out for impermissible reasons for purposes of establishing this *prima facie* requirement.  In particular, there is evidence that plaintiff's supervisor made age-related comments to him; plaintiff complained about the comments to a Pierre's decision-maker (Cillian); and younger workers were recalled for work opportunities after layoff while plaintiff was not.

Pierre's contends that even if a *prima facie* case exists, it is entitled to summary judgment on plaintiff's disparate impact claim because Pierre's had legitimate, non-discriminatory reasons supporting its layoff and recall decisions.  Specifically, Pierre's asserts:

> [I]n 2009 the Company experienced a significant reduction in sales due to the loss of an extremely large customer, as well as a number of other customers. In addition, the Company continued to update its technologies and facilities, thereby creating more efficient operations.  These issues drove the Company's staffing decisions.  (Roth Aff. ¶¶7-13.)  Furthermore, given the elevated costs associated with recalling a full-time bargaining unit member like Plaintiff (including higher wages, medical benefits contributions, multiemployer pension plan contributions, Diary Union Employees Benefit Plan (401k) contributions, workers' compensation insurance and unemployment compensation insurance), Pierre's cannot recall a bargaining unit employee until it is clear that production levels justify such an action.  (Roth Aff. ¶21.)

(Def. Mem. at 14.)

Pierre's argues plaintiff cannot demonstrate that these reasons are pretextual.  It argues that:

---

[2]

Pierre's does not explain why, or submit authority demonstrating, that this case constitutes a so-called "reduction in force" case given that plaintiff does not challenge Pierre's initial decision to lay him off in January 2010, but challenges only Pierre's failure to recall him after his layoff.

[A] number of undisputed facts impede Plaintiff's ability to establish pretext with respect to the Company's decision to use temporary workers while Plaintiff and others remained on layoff.  As discussed . . . Pierre's had significant business reasons for reducing its full-time workforce and occasionally supplementing it with temporary workers in accordance with business needs.  When sales levels and operational projections allowed, the Company recalled bargaining unit employees.  Otherwise, the Company exercised its right to utilize much less expensive part-time workers to meets its short-term needs. . . .

Moreover, the applicable CBA allows for the use of temporary workers, even while members of the bargaining unit remain on layoff.  This is the exact issue that Plaintiff (unsuccessfully) challenged both at the bargaining table and through grievance and arbitration proceedings.

Finally, it is extremely significant and at direct odds with Plaintiff's allegations before this Court that the Company's decisions also delayed the recall of employees Bibb and Hohne, less senior employees who both are outside of the protected age group.  Under these circumstances, Plaintiff cannot establish that the Company's decision not to recall him was a pretext for unlawful age discrimination.

(Def. Mem. at 16.)

Plaintiff contends Pierre's asserted legitimate business reasons for not recalling him are a pretext for unlawful age discrimination, asserting that Pierre's "alleged reasons have no basis in fact, are not the real reason for Pierre's decisions, and are insufficient to explain . . . Pierre's actions."  (Pltf. Opp. at 12.)  Although plaintiff does not dispute that Pierre's had legitimate reasons for laying off bargaining unit employees and had a right under the CBA to hire temporary workers for part time work after the layoffs for purposes of this lawsuit, plaintiff contends facts exist that "belie Pierre's claims that [its] hiring decisions" as to whether to recall full time bargaining unit employees were "solely motivated by costs and production levels" as Pierre's uses to justify its failure to recall plaintiff anytime after his layoff.  Plaintiff contends Pierre's took actions in other instances inconsistent with its asserted

16

justification.

First, plaintiff asserts that when Pierre's had the opportunity to hire a cheaper temporary employee for an employee's disability leave in November 2009, "Pierre's bypassed the temporary staffing agency and recalled Metford Edwards, a full time union employee for two weeks." (Pltf. Opp. at 13.)  According to plaintiff, Pierre's treatment of Edwards was consistent with "Pierre's long standing practice to recall laid off full time employees for part-time assignments of unknown durations." (*Id.*)  But plaintiff contends Pierre's did not adhere to this traditional practice of recalling a laid off employee when part-time opportunities arose and he was next in line according to seniority.

As a further example of pretext, plaintiff asserts that in November 2010, Roberto Cruz, a full time union employee who had more seniority than plaintiff was laid off but Pierre's needed part-time assistance for an unknown period of time.  Rather than exercising its contractual right under the CBA to hire a cheaper, temporary employee to perform the needed part-time work, Pierre's offered Cruz, who is substantially younger than plaintiff, the part-time position.  Plaintiff asserts that "[i]f Pierre's truly was motivated by cheaper costs of temporary employees, then Pierre's would have hired a temp for this position, but "[w]hat happened in reality is different from Pierre's so-called legitimate business reasoning.  Rather than hire a temp, Pierre's offered the part-time work to the laid off employee next in line for recall- Cruz."  Plaintiff argues that had he "been next in line, then Pierre's would have hired the temp no doubt claiming contractual discretion to hire temps combined with lower costs and lower production levels."  Plaintiff further argues:  "If Pierre's truly held to its mantra that it cannot recall bargaining unit employees until its clear that production levels justify it

then Roberto Cruz should have remained on layoff in November 2010 and not re-hired in a part-time position of unknown duration.  This example demonstrates that Pierre's decisionmaking process was not motivated by costs or production but rather was influenced by whether or not Snyder was next in line."  (Pltf. Opp. at 14.)

Finally, plaintiff asserts that another example of disparate treatment occurred in June 2011, when Pierre's put out for bid an open position in the warehouse for "Dock Class A Seasonal Position," but "[n]o one bid on it."  (Pltf. Opp. at 14.)  Plaintiff asserts that "Bittinger then hired temps who were younger than [plaintiff]" but he was "not given an opportunity to bid" on the position.

Plaintiff contends all of these examples support an inference of pretext and demonstrate that Pierre's did not recall full-time employees only when sales and production levels justified.  Instead, Pierre's selectively used its contractual right to hire temporary workers so as to avoid recalling him, an older employee.

In its reply brief, Pierre's contends that the plaintiff has "misconstrued the evidence" as to Pierre's overall business situation and repeats the arguments it emphasized in its opening brief –  that it had valid and legitimate reasons for laying off employees, that the layoffs and recalls were performed in proper seniority order (evidenced by the fact that two other bargaining unit employees younger and less senior than plaintiff were also not recalled by Pierre's), and that it had a contractual right to hire less expensive temporary employees to fill temporary and seasonal needs under the terms of the CBA – all facts that are not disputed on summary judgment.  But Pierre's does not directly address the examples of pretext plaintiff posits in his opposition brief.  In particular, Pierre's does not address plaintiff's argument that

18

pretext exists because Pierre's *inconsistently* utilized its contractual right under the CBA to hire temporary employees depending on whether plaintiff was next in line for recall.  Pierre's does not explain or refute plaintiff's evidence tending to show that Pierre's did not always use temporary employees when it could have.  In particular, Pierre's does not address or dispute plaintiff's evidence that Roberto Cruz was offered part-time work of unknown duration after he was laid off from his full time position in November 2010.  This action by Pierre's is inconsistent with Pierre's asserted legitimate nondiscriminatory reason for not recalling plaintiff to part time work, *i.e.*, that Pierre's recalled bargaining unit employees after a layoff only when its sales levels and operational projections allowed.  Pierre's does not take the position that this was the situation in November 2010 when it offered Cruz part-time work after Cruz was laid off.  Pierre's does not dispute that it could have hired a cheaper, temporary employee in November 2010 rather than hiring Cruz.

In sum, even though Pierre's had legitimate reasons for laying off employees and had a contractual right under the CBA to utilize temporary workers, plaintiff has come forward with sufficient evidence on summary judgment to show pretext, specifically, evidence tending to show that Pierre's did not consistently adhere to its asserted policy of recalling laid off bargaining unit employees only when sales levels and operational projections allowed.  And Pierre's always exercised its contractual right to use temporary workers when plaintiff, an older employee, was next in line for recall.  The evidence plaintiff refers to on summary judgment, viewed in the light most favorable to plaintiff, is sufficient to support plaintiff's theory that he was "disfavored" by Pierre's in regard to recall opportunities.

Pierre's motion for summary judgment on plaintiff's disparate treatment claim alleged

19

in Count I is denied in that the evidence viewed most favorably to plaintiff is sufficient to

demonstrate a *prima facie* case and to show that Pierre's asserted legitimate

nondiscriminatory reason is not the real reason Pierre's failed to offer plaintiff any work

opportunity after his layoff.

*Count II – Hostile Work Environment*

The Sixth Circuit has acknowledged that a plaintiff may advance a hostile

environment claim under the ADEA.  *Crawford v. Medina General Hospital*, 96 F.3d 830,

834 (6th Cir. 1996).  In order to establish a *prima facie* case of a hostile work environment,

the plaintiff must show that: (1) he is 40 years old or older; (2) he was subjected to

harassment, either through words or actions, based on age; (3) the harassment had the effect

of unreasonably interfering with the employee's work performance and creating an

objectively intimidating, hostile, or offensive work environment; and (4) there exists some

basis for liability on the part of the employer.  *Id.* at 834-35.

Pierre's contends that plaintiff cannot make out a *prima facie* case.  First, Pierre's

argues that plaintiff was not subjected to unwelcome age-based harassment.  Pierre's asserts

that Bittinger's alleged comments toward plaintiff and others in the warehouse do not

demonstrate "age-based animus," but instead amount to nothing more than "simple teasing,

offhand comments, and isolated incidents."  (Def. Mem. at 18-19.)  Pierre's argues:

> Plaintiff testified that Mr. Bittinger allowed a casual, joking atmosphere in the
> warehouse, and that many employees (including Plaintiff) engaged in shop
> talk, swearing, joking and name-calling.  In addition, Bittinger's purportedly
> harassing comments and conduct were not directed solely at Plaintiff.  Plaintiff
> acknowledged that Bittinger also treated *younger* employees harshly at times.
> Plaintiff's co-workers, likewise, testified that Bittinger referred to other,
> younger employees as "old man."

20

Furthermore, Plaintiff cannot establish that the alleged comments attributable to Mr. Bittinger were unwelcome, particularly where Plaintiff was a frequent and willing participant in the conduct with which he now takes issue.  Plaintiff repeatedly referred to Mr. Bittinger as "fat chick," "fat boy," "balloon head," "Pillsbury dough boy," and "beached whale."  He similarly referred to his co-worker Ken Ashcraft as "Ass"croft; he referred to co-worker Chuck Hohne as Chuch "Horny;" and he referred to [a] co-worker named George as "Brutal," "because he didn't have a neck," and . . . "[r]eminded plaintiff] of Popeye."

At no point did Plaintiff receive discipline for the comments he made, nor did he ever filed a complaint or grievance due to the purported comments that were directed at him.  This underscores the fact that the comments – both those that Plaintiff received and those that he made – were made in jest, were not unwelcome, and were not discriminatory in nature.  Plaintiff himself admitted that when Bittinger referred to him as "old man," he did so jokingly – at least at first.

(Def. Mem. at 18-19) (internal citations omitted.)

Pierre's also argues that plaintiff cannot satisfy the third prong of a *prima facie* hostile work environment claim requiring plaintiff to show that, under the "totality of the circumstances," the harassment was "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560, 562 (6th Cir.1999) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)).  The severe or pervasive requirement has both an objective and a subjective component.  *Harris*, 510 U.S. at 21-22.  It requires the court to examine, under the totality of the circumstances, the following factors:  (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interfered with an employee's performance.  *Clay v. UPS,* 501 F.3d 724, 733 (6th Cir. 2007).  As the Supreme Court stated in *Harris*,

Conduct that is not severe or pervasive enough to create an objectively hostile

21

> or abusive work environment—an environment that a reasonable person would
> find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim
> does not subjectively perceive the environment to be abusive, the conduct has
> not actually altered the conditions of the victim's employment, and there is no
> Title VII violation.

*Harris*, 510 U.S. at 21–22.  A court must review the work environment as a whole because,

under certain circumstances, a hostile work environment may be proven by establishing the

cumulative effect of related acts of abuse.  *See Williams*, 187 F.3d at 563.

Pierre's contends that none of the factors considered in determining the severe and

pervasive requirement weigh in plaintiff's favor, arguing that

> the sum total of Plaintiff's hostile work environment evidence is his testimony
> that Bittinger called him "old man" 50-60 times over the course of three years;
> asked him if he need "a walker" 20 to 30 times; asked him if he needed "a
> cane" 20 to 30 times, and asked him if he needed an "oxygen tank."  In
> addition, Plaintiff testified that Bittinger once stated in 2009, "nothing against
> you personally, but if I was in charge, I would never have hired you.  You're
> too old.  Based upon relevant case law . . ., these comments, even viewed in a
> light most favorable to Plaintiff, are not sufficiently severe or pervasive to
> create a hostile work environment.

(Def. Mem. at 21-22.)

Further, Pierre's argues that plaintiff's failure to file a complaint or grievance, and his

own participation in the "joking conduct" he now challenges, further belie his claim of a

subjectively hostile work environment and constitute evidence that plaintiff did not consider

his workplace to be subjectively intolerable.

Finally, Pierre's argues plaintiff cannot demonstrate that the alleged harassing conduct

"altered the terms or conditions of [plaintiff's] employment or otherwise interfered with his

work performance," relying on plaintiff's deposition testimony acknowledging that he was

always able to do his job well and that Bittinger's words and names did not affect his ability

to do his work.  (Def. Mem. at 24.)  Plaintiff testified:

> Q:  Did Bittinger's words or the names affect your ability to work?
>
> A:  I wouldn't say affected my ability to work.  Get you all stressed out, aggravated, frustrated, kind of humiliated.  You know, people standing there chuckling.
>
> Q:  But you were always able to do your job, right?
>
> A:  Always.
>
> Q:  Always did a good job?
>
> A: Never wrote up all the time.
>
> Q: You never let the words affect your ability to do your job?
>
> A: No.  I had a job to perform.

(Pltf. Dep. at 174.)

In his opposition brief, plaintiff contends that the factors for determining severe and pervasive harassment weigh in his favor.[3]  To support this position, plaintiff argues:

> [Plaintiff's] supervisor, John Bittinger admitted that he made age related comments to [plaintiff] every day.  (Bittinger Dep. 33)  Snyder and co-worker Ashcraft describe Bittinger as yelling, screaming, slamming doors, and verbally abusing Snyder and Ashcraft.  It was not funny according to Ashcraft.  Snyder felt Bittinger's actions were humiliating.  (Snyder Dep. 174)  Bittinger's age related comments and tirades. [sic]  Snyder felt stressed, aggravated, frustrated, humiliated and abused.  (Snyder Dep. 172, 174)  This occurred "every day he worked there."  (Bittinger Dep. 33)

Plaintiff asserts that "Pierre's knew that Bittinger had created a harassing and hostile environment" because "this" was cited as an area needing improvement in Bittinger's performance reviews.  Plaintiff submits a 2009 review indicating that Bittinger received a

---

[3]     Plaintiff does not address Pierre's argument that Bittinger's alleged comments do not demonstrate "age-based" harassment or animus.

23

"marginal" performance appraisal in the category "is discrete in speech and action" and listed as a goal and objective: "[p]lease refrain from using derogatory remarks about co-workers." A 2007 review noted:  "there are times when John does not carefully monitor the words he chooses when speaking with his subordinates.  Sometimes the humor is graphic and the language less proper than it should be."  A 2010 review states: "Needs to practice better choice of words and tone of voice when talking to subordinates."

Finally, plaintiff argues that Bittinger's harassment "did effect the terms and conditions of Snyder's employment" citing to his deposition testimony that he was "was stressed out all the time and humiliated."  (Pltf. Opp. at 16.)  He also refers to his deposition testimony that he did not file a grievance about the harassment because he was concerned about losing his job.

Pierre's motion for summary judgment is granted as to plaintiff's hostile work environment claim.  Even assuming that the second prong of a *prima facie* is established and Bittinger's comments constitute harassment of plaintiff based on his age, Pierre's arguments are persuasive that the totality of the circumstances does not demonstrate that the harassment plaintiff complains of, either subjectively or objectively, was so "severe or pervasive" that it altered the conditions of plaintiff's employment or created an abusive working environment within the meaning of *Harris*.

While plaintiff testified that Bittinger's comments were frequent and severe, plaintiff significantly testified that, despite Bittinger's treatment of him, he liked his job and was able to perform it.  That is, Bittinger's comments did not affect plaintiff's ability to do his job. Furthermore, plaintiff acknowledges that shop talk and insults were common in the

24

warehouse and that he himself participated in such banter.  This is evidence that plaintiff did not subjectively consider Bittinger's derogatory comments to be unreasonable or intolerable and tends to show that the comments were not physically threatening or humiliating but were merely offensive utterances.  Also significant in this regard is the fact that plaintiff never filed any grievance or formal complaint about Bittinger's treatment of him until six months after he was laid off in January 2010, despite the fact that he clearly knew how to file and actively pursued other grievances during his employment.  Plaintiff's argument in his opposition brief that he did not grieve the issue of harassment because he feared for his job is not credible in light of the fact that plaintiff filed a number of other grievances during his employment on a variety of issues and points to no evidence supporting the notion that his job was in jeopardy because of such conduct.  Finally, while plaintiff's testified that he was "stressed out, aggravated, frustrated, [and] kind of humiliated" by Bittinger's conduct and that Bittinger's conduct caused people in the warehouse to "chuckle" at him, such facts are not sufficient to demonstrate the kind of "severe and pervasive" harassment that creates an objectively hostile working environment or alters the conditions of employment under *Harris*.

Pierre's motion for summary judgment on Count II is granted because the evidence the plaintiff points to on summary judgment is insufficient to show, under the "totality of the circumstances," that the harassment plaintiff complains of was so sufficiently severe or pervasive as to alter the conditions of plaintiff's employment and create an abusive working environment.

**Conclusion**

For the reasons discussed above, Pierre's motion for summary judgment is granted as

to plaintiff's hostile work environment claim in Count II but denied as to plaintiff's disparate treatment claim in Count I.

        IT IS SO ORDERED.


                          /s/ Patricia A. Gaughan
                          PATRICIA A. GAUGHAN
                          United States District Judge

Dated: 11/30/12

26